## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| SCOTT WORTHINGTON, individually and on behalf of all others similarly situated, | : : : : | Case No.: |
| Plaintiff, | : | **CLASS ACTION COMPLAINT** |
| v. | : : | |
| VOLKSWAGEN GROUP OF AMERICA, INC., a New Jersey Corporation, d/b/a VOLKSWAGEN OF AMERICA, INC., and VOLKSWAGEN AG, a German Corporation. | : : : : : : | **DEMAND FOR JURY TRIAL** |
| Defendants. | : | |

Plaintiff Scott Worthington brings this action against Volkswagen Group of America, Inc. d/b/a Volkswagen of America, Inc. and Volkswagen AG (collectively "Defendantss" or "Volkswagen"). Plaintiff alleges the following based on: (a) personal knowledge, (b) the investigation of counsel, and (c) information and belief:

## **INTRODUCTION**

1.      This is a class action lawsuit brought by Plaintiff individually and on behalf of a class of current and former owners and lessees of model years 2022-2023 VW Tiguan vehicles (hereinafter referred to collectively as the "Tiguans" or "Class

Vehicles"). VW designed, manufactured, marketed and warranted the Class Vehicles.[1]

2.    This action arises from VW's failure to disclose to Plaintiff and similarly situated consumers that the Class Vehicles contain a design defect which causes them to consume an excessively high rate of engine oil (the "Oil Consumption Defect" or the "Defect"). As described in more detail below, the Oil Consumption Defect causes the Class Vehicles to prematurely burn off and/or consume abnormal and excessive amounts of engine oil.

3.    The Oil Consumption Defect requires vehicle operators to re-fill or top off their oil at intervals significantly shorter than those set forth by VW. This frequent replenishment of oil requires consumers to incur out of pocket expenses that were not contemplated at the time of purchase. Further, the Oil Consumption Defect can cause unexpected engine stalling and engine failure while the Class Vehicles are in operation at any time and under any driving condition or speed. This exposes the driver and occupants of the Class Vehicles, as well as others who share the road with them, to an increased risk of an accident.

4.    VW has long been aware of the Oil Consumption Defect. Yet, notwithstanding its longstanding knowledge of this problem, VW has routinely

---

[1] Plaintiff reserves the right to amend or add to the vehicle models included in the definition of Class Vehicles after conducting discovery.

refused to adequately repair the Class Vehicles without charge when the Defect manifests. VW has even refused to acknowledge the Oil Consumption Defect's existence when Class Vehicles displaying symptoms consistent with the Defect are brought in for service, instead telling consumers that nothing is wrong with their car.

5.     As a result of VW's unfair, deceptive and/or fraudulent business practices, owners and/or lessees of the Class Vehicles, including Plaintiff, have suffered an ascertainable loss of money and/or property and/or loss in value. Had Plaintiff and Class Members known about the Oil Consumption Defect at the time of their purchase or lease transaction, they would not have purchased or leased the Class Vehicles or they would have paid substantially less for them.

6.     As a direct result of VW's wrongful conduct, Plaintiff and Class Members have been harmed and are entitled to actual damages, including damages for the benefit of the bargain they struck when purchasing their vehicles, the diminished value of their vehicles, statutory damages, compensatory damages, attorneys' fees, costs, restitution, and injunctive and declaratory relief.

7.     This case seeks protection and relief for owners and lessees of the Class Vehicles for the harm they have suffered, and the safety risks they face, from Defendants' breaches of express and implied warranties and Defendants' unfair, unlawful, and deceptive trade practices.

## **JURISDICTION AND VENUE**

8.      This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different States.  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

9.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendants transact business in this district, are subject to personal jurisdiction in this district, and therefore deemed to be citizens of this district. Additionally, a substantial part of the events or omissions giving rise to the claims occurred in this district, Defendants have advertised in this district, and Defendants have received substantial revenue and profits from its sales and/or leasing of Class Vehicles in this district.

10.     This Court has personal jurisdiction over Defendants because they have conducted substantial business in this judicial district, and intentionally and purposefully placed Class Vehicles into the stream of commerce within the state of New Jersey and throughout the United States.

## PARTIES

**Plaintiff Scott Worthington**

11.     Plaintiff Scott Worthington is a resident and citizen of Saint Louis Park, Minnesota.

12.     Plaintiff Worthington purchased a 2022 Volkswagen Tiguan in March 2022 from Luther Brookdale Volkswagen, an authorized Volkswagen dealership located in Brooklyn Center, Minnesota.

13.     Plaintiff Worthington purchased (and still owns) this vehicle, which is used for personal and/or household use. His vehicle contains a 2.0L engine. His vehicle bears Vehicle Identification Number: 3VV2B7AX7NM077705.

14.     Prior to purchase, Plaintiff Worthington researched the vehicle on VW's website, reviewed VW marketing and promotional materials available at the dealership, spoke with VW sales representatives test drove the vehicle, and reviewed the vehicle's Monroney sticker. None of these sources disclosed the Defect to Plaintiff Worthington.

15.     In or around October of 2023, when Plaintiff Worthington's vehicle had approximately 37,000 miles on the odometer, Plaintiff Worthington noticed the "low oil" alert on his dashboard. Plaintiff Worthington promptly brought his vehicle to Luther Brookdale Volkswagen to report an oil consumption issue. Luther Brookdale

performed an oil change and informed Plaintiff Worthington that nothing was wrong with his vehicle, i.e., his vehicle had been consuming oil at a "normal" rate.

16.    From October of 2023 to present, Plaintiff Worthington's vehicle frequently displays a "low oil" alert on his dashboard. In between oil changes, Plaintiff Worthington puts one quart of oil into his vehicle.

17.    In February, June, and September of 2024, when his vehicle had approximately 48,844, 58,940, and 67,781 miles on the odometer, respectively, Plaintiff Worthington brought his vehicle to Luther Brookdale for oil changes and again reported the oil consumption issue. Luther Brookdale again informed Plaintiff Worthington that nothing was wrong with his vehicle.

18.    Additionally in September of 2024, Luther Brookdale offered to perform an oil consumption test at Plaintiff Worthington's expense. Due to the cost and his belief that VW should bear the costs of the test, Plaintiff Worthington declined the test.

19.    In January 2025, when his vehicle had approximately 77,650 miles on the odometer, Plaintiff Worthington again brought his vehicle to Luther Brookdale for an oil change and to again report the oil consumption issue. Luther Brookdale performed an oil change. This time, however, Luther Brookdale informed Plaintiff Worthington that he could obtain an oil consumption test at no cost to Plaintiff Worthington. However, Luther Brookdale further informed him that if the oil

consumption test revealed a necessary repair, Plaintiff Worthington would be financially responsible for the costs to repair because he was outside the warranty period. Plaintiff Worthington has not yet completed an oil consumption test.

20.    Plaintiff Worthington had reported the oil consumption issue to Luther Brookdale on multiple occasions since October 2023, yet neither Volkswagen nor the dealership has been unable to provide Plaintiff Worthington with proper assistance or remedy.

21.    Plaintiff Worthington did not drive his car excessively during this period.

22.    At all times relevant herein, Plaintiff Worthington adhered to VW's recommended maintenance intervals.

23.    Plaintiff Worthington has suffered an ascertainable loss as a result of Defendants' omissions and/or misrepresentations associated with the Oil Consumption Defect, including, but not limited to, out-of-pocket losses associated with the Oil Consumption Defect, diminished value of his vehicle, and other consequential damages. Specifically, Plaintiff Worthington has spent approximately $300 in out-of-pocket expenses for the purchase of oil. He will continue to incur out-of-pocket expenses absent an adequate remedy by VW to cure the Defect.

24.    Neither VW, nor any of its agents, dealers, or other representatives informed Plaintiff Worthington of the existence of the Oil Consumption Defect prior

to his purchase. Had Defendants disclosed the Defect to Plaintiff Worthington, he would not have purchased the vehicle, or would have paid substantially less for it.

**<u>Defendants</u>**

25.    Defendant Volkswagen Group of America, Inc. ("Volkswagen of America") is a New Jersey corporation with its principal place of business located at 2200 Ferdinand Porsche Drive, Herndon, Virginia 20171.

26.    Defendant Volkswagen Group of America, Inc. is a "wholly owned subsidiary of Volkswagen AG, one of the world's leading automobile manufacturers and the largest carmaker in Europe."2

27.    Volkswagen AG ("VWAG") is headquartered in Wolfsburg, Germany.

28.    Defendants manufacture, distribute, market, service, repair, sell, and lease passenger vehicles, including the Class Vehicles.

29.    At all times material to this Complaint, Defendants have advertised, marketed, offered for sale, sold, offered for lease, leased, and distributed motor vehicles, including the Class Vehicles, to consumers in New Jersey as well as throughout the United States.

---

2 http://www.volkswagengroupofamerica.com/about (last visited January 30, 2025).

30.     Upon information and belief, the design, manufacture, distribution, service, repair, modification, installation and decisions regarding the Class Vehicles were performed exclusively by Defendants.

31.     Upon information and belief, Defendants develop the owners' manuals, warranty booklets and information included in maintenance recommendations and/or schedules for the Class Vehicles.

32.     Defendants engage in continuous and substantial business in New as well as throughout the United States.

33.     Volkswagen Group of America, Inc. is a duly organized New Jersey corporation with a principal place of business at 2200 Woodland Pointe Ave, Herndon, Virginia 20171. VWAG is the parent of Volkswagen of America. Volkswagen of America manufactures, imports, distributes and/or sells Volkswagen motor vehicles including the Class Vehicles, and also acts as the authorized representative of VWAG in the United States. Volkswagen of America drafted and published the owner's manual and USA Warranty and Maintenance manual that accompanied Class Vehicles and acted, and continues to act, as the warrantor of vehicles constructed by VWAG and Volkswagen of America that are sold in the United States. At all relevant times, Volkswagen of America acted as an authorized agent, representative, servant, employee, and/or alter ego of VWAG performing activities concerning but not limited to advertising, warranties, warranty repairs,

dissemination of technical information, and monitoring the performance of Volkswagen vehicles in the United States, including substantial activities that occurred within this jurisdiction. VWAG is the parent company of Volkswagen of America.

## **FACTUAL ALLEGATIONS**

### A.    **The Oil Consumption within the Class Vehicles**

34.    VW designs, engineers, manufactures and sells vehicles through its network of authorized motor vehicle dealers.

35.    Since VW's Tiguan entered the market in 2007, almost 1 million Tiguans have been sold in the United States.[3]  VW has shared that since 2018, the Tiguan has been the bestselling Volkswagen.[4]

36.    The 2.0L engine, which VW used in the Class Vehicles, is a 2.0-liter engine that was manufactured by Defendant VW.

37.    The engines in the Class Vehicles have an engine oil capacity of 5 quarts.[5]

---

[3]    https://www.goodcarbadcar.net/volkswagen-tiguan-sales-figures/  (last visited January 30, 2025).
[4] https://www.volkswagen-newsroom.com/en/press-releases/new-tiguan-generation-volkswagens-bestseller-celebrates-world-premiere-in-front-of-10000-employees-17655 (last visited January 30, 2025).
[5]    https://www.asburyauto.com/2022-volkswagen-tiguan-oil-change  (last visited January 30, 2025).

38.     According to Defendants, each Class Vehicle contains a smart oil monitor that gauges how much oil is in your engine and illuminates a light on a driver's dashboard when it is ready to be refilled.[6] VW suggests an oil change every 10,000 miles or every year, whichever occurs first.[7]

39.     As background, the engines contained in the Class Vehicles use four reciprocating pistons to convert pressure into a rotating motion. Gasoline is mixed with air in the combustion chambers of the engine. To generate such rotating motion, a four-step sequence is used (the "Combustion Cycle"). First, the intake stroke begins with the inlet valve opening and a vaporized fuel mixture is pulled into the combustion chamber. Second, the compression stroke begins with the inlet valve closing and the piston beginning its movement upward, compressing the fuel mixture in the combustion chamber. Third, the power stroke begins when the spark plug ignites the fuel mixture, expanding the gases and generating power that is transmitted to the crankshaft. Fourth, the exhaust stroke begins with the exhaust valve opening and the piston moving back down, allowing the exhaust gases to escape the cylinder. The exhaust valve then closes, the inlet valve opens, and the Combustion Cycle repeats itself. A diagram of the Combustion Cycle is below:

---

[6]     https://www.lokeyvw.com/blog/volkswagen-tiguan-service-faq-essential-maintenance-guide/ (last visited January 30, 2025).

[7] https://static.nhtsa.gov/odi/tsbs/2021/MC-10190515-0001.pdf (last visited January 30, 2025).



Intake Stroke     Compression Stroke     Power Stroke     Exhaust Stroke

40.    During this process, engine oil is used to lubricate the piston and cylinder wall as the piston moves up and down through the four-stroke sequence. Engine oil is also necessary in this process to reduce wear on moving parts throughout the engine, improve sealing, and cool the engine by carrying heat away from the moving parts. If there is an insufficient amount of engine oil, the engine will not have the necessary lubrication or cooling, thereby causing premature wear of internal parts, inadequate performance, and/or catastrophic engine failure.

41.    The top sidewall of each engine piston contains rings that, when correctly sized and installed, and when properly tensioned, prevent engine oil from entering the combustion chamber, as well as optimizing compression. On each

piston, there are three rings: the top compression ring, the second compression ring, and the oil control ring.

42.    The top compression ring is the top ring, or closest ring to the inlet and combustion gases, and is exposed to the greatest amount of chemical corrosion and the highest operating temperature. The compression ring transfers approximately 70% of the combustion chamber heat from the piston to the cylinder wall.

43.    The second compression ring, also known as the wiper ring, is used to further seal the combustion chamber and to wipe the cylinder wall clean of excess oil. Combustion gases that pass by the top compression ring are stopped by the second compression ring.

44.    The bottom ring, known as the oil control ring, is used to wipe excess oil from the cylinder wall during piston movement and return excess oil through the ring openings and oil drain holes to the engine oil pan. The oil control ring includes two thin rails or running surfaces.

45.    If engine oil is able to pass between any of these piston rings and the surface of the cylinder wall, then the engine oil will enter the combustion chamber of the engine. Once engine oil is in the combustion chamber, it will not only cause a decrease in engine performance, but the engine oil will also be burned off during the Combustion Cycle sequence thereby reducing the overall amount of oil contained in the engine. Furthermore, engine oil in the combustion chamber will also cause a

decrease in fuel efficiency, cause carbon deposits to form within the engine, and damage the vehicle ignition and emission components. An exemplar diagram of a piston with these rings is shown below:



46.    Upon information and belief, the piston and piston ring assembly in the Class Vehicles contain a manufacturing defect including, *inter alia*, insufficient piston ring tension, causing them to allow engine oil into the combustion chamber of the engine. As a result, engine oil is not separated from the Combustion Cycle as intended. Instead, engine oil is burned and consumed during the Combustion Cycle. Additionally, and as a result, the crankcase becomes pressurized since gases from the Combustion Cycle are caused to enter the crankcase.

47. Throughout the Combustion Process, engine oil is pumped from the crankcase, circulated throughout the engine, filtered and then returned to the crankcase to begin the cycle again. To reduce the risk of crankcase contamination and improve vehicle emissions, the positive crankshaft ventilation ("PCV") system was invented in the early 1960s. The PCV system involves the recycling of these unwanted gases through a valve (the "PCV valve") and circulates them back into the intake manifold, where they are pumped back into the cylinders for another chance at being burned during the combustion cycle. A diagram of a typical PCV system is below:



48.     In the Class Vehicles, the PCV system is inadequate and fails to reduce pressure within the crankcase caused by combustion gases escaping from the combustion chamber, past the piston and oil rings, and into the crankcase. This is because the increased blow-by as a result of the reduced piston and oil control ring tensions in an effort to decrease overall friction within the engine in the hopes of gaining greater MPG. As a result, this has a direct negative impact on the vehicles durability, life expectancy, performance and emissions.

**B.     The Oil Consumption Defect Causes Higher Emissions.**

49.     As discussed above, on information and belief, the engine oil control strategy in the Class Vehicles does not work as intended, allowing oil to escape past the oil control and piston rings and enter the combustion chamber during the Combustion Process. Once in the combustion chamber, oil is burned off rather than returned for further lubrication. This not only causes a decrease in engine performance but also decreases fuel efficiency, causes carbon deposits to form, and can damage the engine and various ignition and emission components.

50.     Optimum cylinder combustion depends on the correct air to fuel ratio in order to provide a near stoichiometric mixture (*i.e.*, the fuel amount is neither excessive nor lacking).[8] The oxygen sensors monitor unburned oxygen in the

---

[8] The stoichiometric mixture for a gasoline engine is the ideal ratio of air to fuel that burns all fuel with no excess air. For gasoline fuel, the stoichiometric air–

exhaust gases and send this information to the vehicle's engine control module, which then uses this information to determine if the fuel mixture is rich (too much fuel) or lean (not enough fuel) and adjusts the air/fuel mixture as necessary. The oxygen sensors also measure oxygen levels after the exhaust reacts with the catalytic converter, to help the engine run efficiently and to minimize emissions. The catalytic converters are emissions control devices designed to convert toxic pollutants, contained in exhaust gases, to less toxic pollutants by catalyzing a redox reaction (oxidation or reduction).

51.    While a significant amount of the engine oil is burned within the combustion chamber during the Combustion Process, the remaining unburned oil exits the engine via the exhaust system, including through the catalytic converter. Excess oil entering the exhaust system causes increases in harmful emissions.

52.    The Oil Consumption Defect can contaminate Class Vehicles' oxygen sensors, catalytic converters, and spark plugs, damaging and causing inefficiency of those parts, and leading to less efficient engines and increased emissions. Contamination can impair the oxygen sensors' accuracy, for example, hampering the catalytic converters and causing the engine to not properly detect emission issues. Likewise, the catalytic converters can become poisoned after engine oil is

---

fuel mixture is about 14.7:1 i.e. for every one gram of fuel, 14.7 grams of air are required.

burned during the combustion cycle. The burnt oil is incorporated into the vehicle's expelled exhaust gases, with the exhaust containing substances that coat the working surfaces of the catalytic converters (encapsulating the catalyst so that it cannot contact and treat the exhaust).

53.    The catalytic converter is the central component to a vehicle's emissions system. Since 1975, all cars and light-duty trucks have come equipped with when the Clean Air Act standards on harmful emissions came into effect.[9] The catalytic converter converts dangerous compounds produced in the combustion process such as carbon monoxide (CO), unburnt hydrocarbons (HC), and nitrogen oxides (Nox) into less harmful carbon dioxide (CO2), nitrogen (N2), and water (H2O).

54.    A catalytic converter has no moving parts and is designed to last the entire useful life of a vehicle. Pressure pushes exhaust gases through two ceramic honeycomb structures made of heat-resistant clay contained within a stainless-steel case. Each of the channels within the honeycomb structure are lined with precious metals such as platinum, rhodium and palladium that act as catalysts to the conversion process. When carbon monoxide (CO), unburnt hydrocarbons (HC), and nitrogen oxides (Nox) molecules come into contact with the platinum, rhodium and

_____

[9] *Automobile Emissions Reduction Efforts in the U.S. – Chronology,* EPA Air and Radiation Office of Mobile Services (1999), http://www.ehso.com/ehshome/auto-emissions_chronol.htm.

palladium, the molecules are stripped apart and then recombined into less harmful carbon dioxide ($CO_2$), nitrogen ($N_2$), and water ($H_2O$). The honeycomb structure increases surface area for these precious metals to come into contact with the harmful carbon monoxide (CO), unburnt hydrocarbons (HC), and nitrogen oxides (NOx).

55.    If excess oil enters the catalytic converter, the conversion process is disrupted. Excess oil will coat the working surfaces of the ceramic honeycombs so that the platinum, rhodium and palladium cannot react with the toxic exhaust gases. This is called "catalyst poisoning" and causes the vehicle to release higher levels of harmful emissions.

56.    Excess oil in the exhaust system can cause other problems that lead to higher emissions. On both sides of the catalytic converter, $O_2$ sensors monitor the concentration of oxygen in the exhaust gases circled in green in the diagram below. The $O_2$ sensors transmit that data to the Engine Control Unit ("ECU").

57.    The phosphorus in the excess oil will foul the $O_2$ sensor, causing the $O_2$ sensor to degrade or fail. When the $O_2$ sensor is fouled, it will communicate to the vehicle's ECU that the fuel/air mixture circulating through the engine is too lean - meaning that there is too little fuel and too much air in the mixture.

58.    The ECU responds by adding fuel to the fuel/air mixture creating a "rich" fuel mixture ("rich" because there is too much gasoline and too little air).

When engines run using a "rich" fuel mixture, fuel economy declines because the engine is receiving more fuel than it can consume during the combustion process.

59.    If the issue is not repaired, the excess fuel will burn when it mixes with oxygen inside the catalytic converter and melts the ceramic honeycomb structures. As a result, the catalytic converter's ability to reduce harmful emissions will be compromised.

60.    When the catalytic converter or O2 sensors are compromised, the Check Engine light should illuminate on the display panel informing the driver of a problem. Upon information and belief, the Class Vehicles fail to provide notice of an issue to the driver. The result is that drivers are left completely unaware that the dangerous Oil Consumption Defect is also causing the Class Vehicles to have an emissions system that is defective, pollutes at levels that exceed the intended levels, and violate state and federal emissions standards.

61.    On January 17, 2006, the EPA issued two final rules related to exhaust emission durability for passenger trucks and other vehicles. Under these rules, truck and engine manufacturers can use one of two methods for testing the exhaust emissions' durability—using a chassis dynamometer to test the vehicles after they have run for a given period of time or using a "bench aging" procedure which involves using extreme heat to test certain components, including the catalytic converters.

62.    In either case, certificate holders must test and certify that the vehicles will comply with EPA emissions standards throughout their "useful life," which is currently defined as 120,000 miles. As the Clean Air Act Handbook describes it, "[t]he demonstration of light-duty vehicle emission durability for purposes of certification consists of two elements: (1) emission deterioration (the extent emissions will increase during the vehicle's useful life); and (2) component durability (whether emission-related components will operate properly for the useful life of the vehicle)."

63.    As a result, VW knew about the Oil Consumption Defect from the beginning, because they are required to test the Class Vehicles for their useful life, and the Oil Consumption Defect would have manifested itself during those tests.

### C.    VW's Longstanding Knowledge of the Defect

#### 1.    Prior TSBs Demonstrate VW's Longstanding Knowledge of Oil Consumption Issues in its Vehicles

64.    VW is no stranger to the Oil Consumption Defect in the Class Vehicles. In September 2024, VW issued a technical service bulletin ("TSB") regarding excessive oil consumption in VW vehicles ("TSB 2017813/19"), which applies to all VW vehicles produced between 2000-2025, including Class Vehicles, which have been, with the exception of the Routan and ID.4. TSB 2017813/19 is attached hereto as **Exhibit A**.

65.    TSBs are essentially an acknowledgement of a vehicle manufacturer,

such as VW, that it has noticed a pattern that is likely indicative of a defect in its vehicle(s) that produces illegal emissions or could injure drivers and their passengers.[10] In TSBs VW suggests the proper way to repair these known issues. *Id.* TSBs standardize service throughout VW's agent dealership network, and explicitly are not meant for consumer review. Further, these communications often do not reveal the root cause of a problem, only describe a complaint and a remedy, frequently in terms that a lay person would not understand, and do not disclose the severity or scope across all the vehicles to which the TSB relates.

66.    The Revision Table on TSB 2017813/19 lists previous TSBs issued by VW regarding the Oil Consumption Defect. Ex. A, 1. It appears that the original TSB acknowledging the Oil Consumption Defect was issued on December 10, 2008, and revised versions of the same TSB have been issued periodically to include new models that are released each year.[11] Despite the longstanding issue, VW does not offer a way to solve the problem under the "Product Solution" of its TSBs. *Id.*

67.    TSB 2017813/19 first instructs dealers to inspect the engine for any leaks. If there is not a leak *and* "the customer complains that their engine is

---

[10] https://www.eurocarservice.com/what-is-a-tsb-technical-service-bulletin/#:~:text=Roosevelt%20Way%20NE%2C-,What%20is%20a%20TSB%20(Technical%20Service%20Bulletin)?,that%20doesn't%20close%20properly. (last visited January 30, 2025).
[11] *Id.*; *see also* https://static.nhtsa.gov/odi/tsbs/2022/MC-10209100-0001.pdf (last visited January 30, 2025).

apparently consuming oil in excess of the Volkswagen oil consumption standard,"
then the dealer must complete the three-step "Oil Consumption Test" prescribed in
TSB 2017813/19 "**before any repair is carried out.**"   Ex. A, 2 (emphasis in
original).

68.    For part one of the Oil Consumption Test, the dealer must fill the
customer's oil and measure the amount of oil added to the customer's vehicle. *Id.* at
2-3.

69.    For part two, after driving the vehicle for not less than 630 miles, when
the customer returns the vehicle to the dealership, the dealer needs to measure the
amount of oil in the vehicle again.[12] *Id.* at 3. If the results of part two of the Oil
Consumption Test plan were "within specification no further work is to be
performed." *Id.* VW indicates that "Volkswagen oil consumption standard [is] up to
0.5 quarts per 600 miles."  *Id.* at 1.

70.    Part three of the Test should only be performed if the results of part two
are "outside of the allowable specification." *Id.* at 3.

71.    For part three, VW instructs dealers that "[b]efore any repairs are
performed, a Volkswagen Technical Assistance Center (TACS) case must be
opened, and the results of the consumption test, copy of the diagnostic log, and the

---

[12] It is unclear from the language of the TSB as to whether dealers instruct customers
to return, or if they only complete part two of the Test if the customer returns on his
or her own volition. *Id.* at 3.

completed Oil Consumption Measurement Worksheet must be sent for review." *Id.* at 4. TSB 2017813/19 does not provide any information regarding how the Oil Consumption Defect should be resolved. *See generally id.*

72.     Furthermore, TSB 2017813/19 provides that if the "result of the test is that the oil consumption is within the permissible tolerance, another [O]il [C]onsumption [T]est on the same engine will not be covered under Warranty within the next 25,000 miles." *Id.* at 4.

73.     Upon information and belief, VW has had longstanding knowledge of the Oil Consumption Defect in nearly all of its vehicles, including Class Vehicles and, yet, does not provide any solution for this Defect.

## 2.     Reports to NHTSA and VW's Technical Service Bulletins

74.     The Office of Defects Investigation within NHTSA conducts defect investigations and administers safety recalls to support NHTSA's mission to improve safety on the Nation's highways.[13] All vehicle manufacturers, including Defendants, are legally obligated to routinely monitor and analyze NHTSA complaints in order to determine whether vehicles or automotive components should be recalled due to safety concerns, and Defendants thus had knowledge of any and

_____

[13] *See* NHTSA URGES EVERYONE TO CHECK FOR RECALLS DURING VEHICLE SAFETY RECALLS WEEK, https://www.nhtsa.gov/press-releases/check-recalls-during-vehicle-safety-recalls-week. (last visited January 30, 2025) (Vehicle manufacturers are required by law to report any potential safety defects to the United States government).

all NHTSA complaints.  *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

75.    The following is just a small sampling of the many complaints submitted to NHTSA by Class Vehicle owners. These publicly available complaints evidence Defendants' knowledge of the Defect, the negative experiences encountered by Class Members, and the financial burden this places on them:[14]

**NHTSA ID Number:** 11508357
**Complaint Date:** February 16, 2023
**Consumer Location:** Ruskin, FL
**Vehicle Identification Number:** 3VV3B7AX3NM******
**Summary of Complaint:**
The [complainant] owns a 2022 Volkswagen Tiguan. The [complainant] stated that while driving at an undisclosed speed, the EPC warning light illuminated. Additionally, the vehicle was consuming an excessive amount of engine oil. The vehicle was towed to the dealer however, the mechanic was unable to duplicate the failure. The manufacturer was made aware of the failure. The failure mileage was approximately 16,000.

**NHTSA ID Number:** 11528046
**Complaint Date:** June 21, 2023
**Consumer Location:** Stockton, NY
**Vehicle Identification Number:** 3VV1B7AX4NM******
**Summary of Complaint**
From a cold start even with warming up the car, I can only drive so many feet before the car begins to hesitate as I proceed. It is as if the transmission cannot respond to the petal. At 25k miles, it is persistently getting worse and will visibly hop as I proceed. Then the transmission will finally remember how to drive[,] and it won't do it again until it sits for a while. I make a left turn from my road where the cars are going 55mph. It's an accident waiting to happen. Furthermore, it is the same problem that Volkswagen has been having for the previous years. The dealership claims this

---

[14] The following complaints are reproduced as they appear online. Any typographical errors are attributable to the original author.

is what they do. Also[,] that it's normal for my low oil light to come on in between oil changes!

**NHTSA ID Number:** 11542905
**Complaint Date:** September 5, 2023
**Consumer Location:** Orangeburg, NY
**Vehicle Identification Number:** 3VV0B7AX7NM******
**Summary of Complaint:**
I bought this brand new Tiguan in July 2022. The engine is either leaking or burning engine oil. I have the check engine oil level light on around every 2000-3000 miles. I had been to the dealer several times. They just inspect for leak and added engine oil. The problem still exist. The dealer stated that my car needs oil change every 10k miles. I am going back every 2-3 k miles for engine oil. There is something wrong with the engine. It is burning or consuming the engine oil. Another problem [I] have is the wheel or the brakes. When I was braking at above 60 miles per hours, there is a strong vibration on the wheel or brakes.

**NHTSA ID Number:** 11549749
**Complaint Date:** May 8, 2023
**Consumer Location:** Trumbull, CT
**Vehicle Identification Number:** 3VV2B7AX3NM******
**Summary of Complaint:**
Oil light went on in May 2023, at approximately 15K miles, then again in August 2023, at approximately 17,500 miles. Both times the oil was down 1 quart. We have been seeing smoke come out of the exhaust, intermittently. VW service department did an oil consumption test which resulted in the car burning just under a quart of oil after 600 miles.  They said the car is functioning normally, but if it burned over a 1/2 quart of oil, they would do something, but not sure what they would do.  They have not addressed the "smoke coming out of the exhaust" issue.

**NHTSA ID Number:** 11562466
**Incident Date:** December 28, 2023
**Consumer Location:** Tampa, FL
**Vehicle Identification Number:** 3VV3B7AX4NM******
**Summary of Complaint:**
Car uses lots of oil between oil changes 1 1/2 quart in between suggested change intervals.

**NHTSA ID Number:** 11565944
**Complaint Date:** January 2, 2023

**Consumer Location:** Gaylord, MI
**Vehicle Identification Number:** 3VV2B7AX7NM******
**Summary of Complaint:**
Vehicle has been using oil since it ha[d] approx[iamately] 15k miles. Engine now has 35,000 miles and uses all of its engine oil before its next sched maint[enance]. [I] [h]ave told dealer numerous times, oil consumption test revealed it uses .61 quarts per 1000 miles, but this is normal per VW. What !?!?. VW states to change oil every 10,000 miles, it will be gone and engine will have no oil remaining within the sched sched maint[enance] [period]. Have also contacted VW directly. Also blows blue smoke at start up at times. Engine is junk. Vehicle will have cost over $1000 per mile to own. Dealer and VW keep telling us to just check oil, its normal. I also own a 2003 pontiac vibe with 220k miles, it doesn't do this! I used to be an ASE certified mechanic. This is NOT normal. Car also has the typical hesitation on cold acceleration that is common (look it up), I will file separate complaint. And now p2402 code for an emissions issue. Problems adding up fast and no help from VW or VW dealers.

**NHTSA ID Number:** 11590261
**Complaint Date:** May 3, 2023
**Consumer Location:** Spotsylvania, VA
**Vehicle Identification Number:** 3VV2B7AX2NM******
**Summary of Complaint:**
My vehicle['s] low oil light ca[m]e on and I had just had the oil changed less than 2,000 miles. Took it to local dealership, they stated 2 seals needed to be replaced, they replaced them and stated I should be good but check the oil every so often to make sure. 500 miles goes by I need at least 1 qt of oil, took it back to dealership now they say I need a whole new [h]ead and it is a common problem. They have done about 3-4 in 2024! I feel like that's a safety concern but they don't.

**NHTSA ID Number:** 11591642
**Incident Date:** May 26, 2024
**Consumer Location:** Gallatin, TN
**Vehicle Identification Number:** 3VV1B7AX7NM******
**Summary of Complaint:**
Crankshaft vent valve clogged and failed, causing over[ ]pressurization and oil leaks. Caused the oil pan to crack and upper timing cover to leak per the inspection at Volkswagen. I was driving, going 63mph when it said max engine speed 3000RPM and a light that said EPC started flashing along with the engine light. I turned off cruise control and began to go towards the shoulder and it shuddered and a large white plumb of smoke came out of it. It wouldn't speed up at all while I was getting

over. I had it towed to my home. My husband noticed oil all over the bottom and back of my car. My dipstick had no oil on it at all. We towed it Tuesday morning to Volkswagen.

**NHTSA ID Number:** 11615176
**Complaint Date:** September 6, 2024
**Consumer Location:** Whitehouse, OH
**Vehicle Identification Number:** 3VV2B7AX5NM******
**Summary of Complaint:**
The PVC valve failed on my two-year-old Volkswagen Tiguan at 60,000 miles. As a result, the upper timing gasket was blown, the oil pan went bad, along with several other issues relating to gaskets, seals and sensors, causing an oil leak. This problem was confirmed by my local Volkswagen dealership, and is costing me over $2,000 out-of-pocket. The check engine light was extremely inconsistent - coming on and then going off for days at a time. This is a safety concern. Unfortunately, through research, I have found that many other Tiguan owners are experiencing the same problems, but it does not seem Volkswagen is willing to issue a recall.

**NHTSA ID Number:** 11627427
**Complaint Date:** November 20, 2024
**Consumer Location:** New York, NY
**Vehicle Identification Number:** 3VV8B7AX8NM******
**Summary of Complaint:**
ever since purchasing the car in 2021 I noticed it burns oil very quickly. Every time [I] would bring my car to my local body show before an oil change was do there was always no oil left. I finally brought the car back to VW and they told me it could be the shop was not using the right stuff which [I] knew was not true and they charged me for oil change and told me to come back if the problem continued. Sure enough 6 weeks later the oil light came on. I brought it back to VW and they told me the car has an engine oil consumption issue and they could keep the car from a week to 6 months

76.    VW, through (1) its public acknowledgement of the problem; (2) its

own records of customers' complaints, (3) dealership repair records, (4) records

from the National Highway Traffic Safety Administration (NHTSA), (5) warranty

and post-warranty claims, (6) internal pre-sale durability testing and internal

investigations, and (7) other various sources, has always known or should have known of the Oil Consumption Defect in the Class Vehicles. Yet, at no time has VW disclosed these defects to consumers or warned consumers despite knowing the defects persist today with no known way to remediate the existing Class Vehicles.

77.    VW failed to adequately research, test and/or manufacture the Class Vehicles before warranting, advertising, promoting, marketing, and/or selling them as suitable and safe for use in an intended and/or reasonably foreseeable manner.

78.    VW is experienced in the manufacture of consumer vehicles. As an experienced manufacturer, VW conducts tests, including pre-sale durability testing, to verify the vehicles it sells are free from defects and align with VW's specifications and intended use of the Class, including routine highway travel.

79.    Upon information and belief, VW performs durability testing on its vehicles before they are released for sale to the general public.[15]

80.    Through a variety of quality control metrics, VW knew or should have known of the Oil Consumption Defect in the Class Vehicles prior to and shortly after the time of sale to Class Members.

81.    Consumers have incurred and will continue to incur expenses for repair of engine, should they desire a permanent fix, because the TSB does not adequately

---

[15]    https://atslab.com/specialty/automotive-components/volkswagen-standards-testing/#:~:text=Some%20of%20the%20VW%20validation,vehicles%20over%20an%20extended%20period. (last visited January 30, 2025).

resolve the Oil Consumption Defect. This is so despite VW's plain knowledge—for years—of a latent defect contained in the Class Vehicles manufactured by Defendants.

82.    Upon information and belief, Defendants, through (1) its own records of customers' complaints, (2) dealership repair records, (3) warranty and post-warranty claims, (4) internal pre-sale durability testing and internal investigations, and (5) a variety of other sources was well aware of the Oil Consumption Defect.

83.    Despite Defendants' knowledge of the Oil Consumption Defect, it failed to notify customers of the nature and extent of the problems with Class Vehicles or provide any adequate remedy. Defendants continued to sell Class Vehicles with the Oil Consumption Defect through its authorized dealers all over the United States.

84.    VW knew of the Oil Consumption Defect and its associated defects when performing these quality control metrics on the Class Vehicles.

**D.    Warranties Related to the Defect**

85.    The Class Vehicles come with a four-year/50,000-mile Bumper-to-Bumper Warranty.[16] The warranty lasts for four years from the date delivery of the Class Vehicle is taken, or for 50,000 miles on the odometer, whichever occurs first.

---

[16] https://www.darcarsvw.com/blogs/3659/whats-included-in-a-2022-new-volkswagen-car-warranty/ (last visited January 30, 2025).

86.     The Class Vehicles also come with a four-year/50,000-mile Powertrain Warranty.[17] The Powertrain Warranty covers the transmission, driveshaft, wheels, axles, engine, and anything that makes the car move.[18] Accordingly, the Powertrain Warranty is the applicable warranty related to the Oil Consumption Defect.

87.     VW instructs vehicle owners and lessees to bring their vehicles to a VW dealership for the warranty repairs. Many owners and lessees have presented Class Vehicles to VW dealerships with complaints about the Oil Consumption Defect.

88.     Despite VW's knowledge of the problem—and presumably how to appropriately remediate and prevent the Oil Consumption Defect from recurring—VW refuses to provide appropriate warranty coverage, instead implementing the band-aid TSB and/or informing consumers that the Oil Consumption Defect is normal and oil should be added on a regular basis between oil change intervals, none of which is covered by the warranty nor will it solve the Oil Consumption Defect.

## TOLLING OF STATUTES OF LIMITATION

89.     Defendants were and remain under a continuing duty to disclose to Plaintiff and Class Members the true character, quality, and nature of the Class Vehicles, that this defect is based on poor manufacturing, and that it will require continued costly repairs, poses a safety concern, and diminishes the resale value of

---

[17] *Id.*
[18] *Id.*

the Class Vehicles. As a result of the active concealment by VW, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

90.    Any applicable statute(s) of limitations has been tolled by VW's knowing and active concealment and denial of the facts alleged herein. Plaintiff and Class Members could not have reasonably discovered the true, latent defective nature of the Oil Consumption Defect until shortly before this class action litigation was commenced.

## CLASS ALLEGATIONS

91.    Plaintiff brings this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and the following proposed classes:

**Nationwide Class:**
All persons in the United States who purchased or leased a Class Vehicle.

**Minnesota Subclass:**
All persons who purchased or leased a Class Vehicle in Minnesota.

92.    Excluded from the Class are VW, its employees, officers, directors, legal representatives, heirs, successors, wholly- or partly-owned, and its subsidiaries and affiliates; VW dealers; proposed Class counsel and their employees; the judicial officers and associated court staff assigned to this case and their immediate family members; all persons who make a timely election to be excluded from the Class;

governmental entities; and the judge to whom this case is assigned and his/her immediate family.

93.    <u>Numerosity</u>. Federal Rule of Civil Procedure 23(a)(1): The Class Members are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable. Class Vehicles may be identified during the pendency of this action and all owners and lessors notified by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice. The Class Members may be easily derived from VW's sales records.

94.    <u>Commonality and Predominance</u>. Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class Members, including, without limitation:

      a.  Whether VW engaged in the conduct alleged herein;

      b.  Whether VW designed, advertised, marketed, distributed, leased, sold, or otherwise placed the Class Vehicles into the stream of commerce in the United States;

      c.  Whether the Oil Consumption Defect constitutes a safety defect;

      d.  Whether VW knew about, and failed to disclose, the Oil Consumption Defect at the time Plaintiff and the Class Members purchased their Class Vehicles;

      e.  Whether VW manufactured, marketed, and distributed the Class Vehicles knowing that the Oil Consumption Defect could and would occur;

f. Whether VW's conduct violates consumer protection statutes, false advertising laws, sales contracts, warranty laws, and other laws as asserted herein;

g. Whether VW owed a duty to warn Plaintiff and Class Members about the Oil Consumption Defect;

h. Whether Plaintiff and the other Class Members overpaid for their Class Vehicles;

i. Whether VW breached the warranty by failing to properly inspect and repair the Oil Consumption Defect;

j. Whether Plaintiff and the other Class Members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief; and

k. Whether Plaintiff and the other Class Members are entitled to damages and other monetary relief and, if so, in what amount.

95. <u>Typicality</u>. Federal Rule of Civil Procedure 23(a)(3): Plaintiff's claims are typical of the other Class Members' claims because, among other things, all Class Members were comparably injured through VW's wrongful conduct as described above.

96. <u>Adequacy</u>. Federal Rule of Civil Procedure 23(a)(4): Plaintiff is an adequate Class representative because Plaintiff's interests do not conflict with the interests of the other Class Members they seek to represent; Plaintiff has retained counsel competent and experienced in complex class action litigation; and Plaintiff intends to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and Plaintiff's counsel.

97.    <u>Declaratory and Injunctive Relief</u>. Federal Rule of Civil Procedure 23(b)(2): VW has acted or refused to act on grounds generally applicable to Plaintiff and the other Class Members, thereby making appropriate final injunctive relief and declaratory relief with respect to the Class as a whole.

98.    <u>Superiority</u>. Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against VW, so it would be impracticable for the Class Members to individually seek redress for VW's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

**FIRST CAUSE OF ACTION**
**VIOLATIONS OF THE MINNESOTA PREVENTION OF CONSUMER**
**FRAUD ACT (MINN. STAT. § 325F.68-70)**
(On behalf of the Minnesota Subclass)

99.    Plaintiff Worthington brings this claim individually and on behalf of the Minnesota Subclass.

100.    Plaintiff Worthington and members of the Minnesota Subclass are each "persons" as defined by the Minnesota Prevention of Consumer Fraud Act ("MPCFA"), Minn. Stat. § 325F.68(2).

101.    The Class Vehicles sold or leased to Plaintiff Worthington and the Minnesota Subclass are "Merchandise" as defined by Minn. Stat. § 325F.68(2).

102.    The MPCFA makes unlawful "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby." Minn. Stat. § 325F.69(1). The MPCFA further provides that "any person injured by a violation of [the MPCFA] may bring a civil action and recover damages, together with costs and disbursements, including costs of investigation and reasonable attorney's fees, and receive other equitable relief as determined by the court." Minn. Stat. § 8.31(3a).

103.    VW engaged in unlawful conduct in violation of the MPCFA by making knowing and intentional omissions about Oil Consumption Defect contained in the Class Vehicles. Defendants knowingly failed to disclose the design,

manufacturing and/or material Defect in the Class Vehicles in order to secure the sale of the Class Vehicles, and to offer them at a premium price.

104.    Furthermore, when the Oil Consumption Defect manifests in the Class Vehicles, Defendants also do not reveal to Class Members that such manifestation is the result of a design, manufacturing and/or material defect actually caused by Defendants. Instead, Class Members are forced to pay out of pocket for repairs necessitated by Defendants' defective product.

105.    Defendants did not fully and truthfully disclose to their customers the true nature of the inherent defect in the Class Vehicles, which was not readily discoverable until after the Class Vehicles were purchased. As a result, Plaintiff Worthington and the other Subclass members were fraudulently induced to lease and/or purchase the Class Vehicles with the Defect and all of the resultant problems. These facts that Defendants concealed were solely within Defendants' possession.

106.    Defendants intended that Plaintiff Worthington and the Subclass members rely on the acts of concealment and omissions, so that they would purchase the Class Vehicles.

107.    Defendants' conduct caused Plaintiff Worthington and Subclass members to suffer an ascertainable loss. In addition to direct monetary losses, Plaintiff Worthington and Subclass members have suffered an ascertainable loss by

receiving less than what was promised as well as a diminution in value of the Class Vehicles.

108.   A causal relationship exists between Defendants' unlawful conduct and the ascertainable losses suffered by Plaintiff Worthington and the Subclass members.

109.   Had the Defect in the Class Vehicles been disclosed, Plaintiff Worthington and the Subclass members would not have purchased them or would have paid less for the Class Vehicles had they decided to purchase them.

110.   Plaintiff Worthington and the Subclass members sustained damages as a result of Defendants' unlawful acts and are, therefore, entitled to damages and other relief as provided under the MPCFA.

**SECOND CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTY**
(on behalf of the Nationwide Class and, alternatively the Minnesota Subclass)

111.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

112.   VW manufactured and distributed Class Vehicles throughout the United States for sale to Plaintiff and the Class Members.

113.   VW impliedly warranted to Plaintiff and Class Members that their Class Vehicles were free of defects and were merchantable and fit for their ordinary purpose for which such goods are used.

114.   As alleged herein, VW breached the implied warranty of merchantability because the Class vehicles suffer from the Oil Consumption Defect. The Class Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

115.   After Plaintiff experienced the Oil Consumption Defect and contacted the dealership on multiple occasions without relief, Plaintiff gave reasonable and adequate notice to VW that the Class Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

116.   Defendants impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their engines were manufactured, supplied, distributed, and/or sold by Defendants were safe and reliable for providing transportation and would not experience oil consumption; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use while the Class Vehicles were being operated.

117.   Due to the Oil Consumption Defect, Plaintiff and the members of each of the Classes are unable to operate their vehicles as intended in a safe condition, substantially free from defects. The Class Vehicles do not provide safe and reliable transportation to Plaintiff and the Class Members. As a result, Plaintiff and Class Members are unable to safely drive their Class Vehicles.

118.    Plaintiff did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiff is entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Class. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty, Plaintiff and Class Members have been injured in an amount to be proven at trial.

## THIRD CAUSE OF ACTION
### BREACH OF EXPRESS WARRANTY
(on behalf of the Nationwide Class and, alternatively the Minnesota Subclass)

119.    Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

120.    VW provided all purchasers and lessees of the Class Vehicles with the same express warranties described herein, which became part of the basis of the bargain.

121.    Specifically, Defendants warranted that the Class Vehicles were free from defects in materials or workmanship; and that in the event the Class Vehicles suffered from defects in either of these respects, Defendants would correct such defects at no cost to Plaintiff or Class Members.

122.   The parts affected by the Oil Consumption Defect were distributed by Defendants in the Class Vehicles and are covered by the warranties VW provided to all purchasers and lessors of Class Vehicles.

123.   Defendants breached these warranties by selling and leasing Class Vehicles with the Oil Consumption Defect, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods.

124.   As a direct and proximate cause of VW's breach, Plaintiff and the Class Members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value. Plaintiff and the Class have also incurred and will continue to incur costs related to the diagnosis and repair of the Oil Consumption Defect.

125.   VW's attempt to disclaim or limit these express warranties is unconscionable and unenforceable under the circumstances here.

126.   Specifically, VW's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

127.   The time limits contained in VW's warranty period were also unconscionable and inadequate to protect Plaintiff and Class Members. A gross disparity in bargaining power existed between VW and the Class Members, and

Defendants knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.

128.   Plaintiff and the Classes have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of VW's conduct described herein.

## FOURTH CAUSE OF ACTION
## FRAUDULENT CONCEALMENT
(On behalf of the Nationwide Class and, alternatively, the Minnesota Subclass)

129.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

130.   At all relevant times, Defendants were engaged in the business of designing, manufacturing, distributing, and selling the Class Vehicles.

131.   Defendants, acting through their representatives or agents, sold and/or leased the Class Vehicles throughout the United States.

132.   Defendants willfully, falsely, and knowingly omitted various material facts regarding the quality and character of the Class Vehicles, including that they suffered from the Oil Consumption Defect.

133.   Rather than inform consumers of the truth regarding the Oil Consumption Defect, Defendants concealed material information related to the Defect.

134.    Defendants' omissions were material because the Oil Consumption Defect has a substantial impact not simply on the convenience and cost of vehicle maintenance, but also on the reliability and safety of the Class Vehicles over time.

135.    Defendants omitted this material information to drive up sales and maintain their market power, as consumers would not have purchased the Class Vehicles, or would have paid substantially less for them, had they known the truth.

136.    Plaintiff and the Class Members had no way of knowing about the Oil Consumption Defect.

137.    Plaintiff and Class Members could not have discovered the above information on their own, because Defendants were in the exclusive possession of such information.

138.    Although Defendants have a duty to ensure the accuracy of information regarding the performance of their Class Vehicles, they did not fulfill these duties.

139.    Plaintiff and Class Members sustained injury due to the purchase of Class Vehicles that suffered from the Defect.

140.    Defendants' acts were done maliciously, oppressively, deliberately, and with intent to defraud, and in reckless disregard of Plaintiff and Class Members' rights and well-being, and in part to enrich themselves at the expense of consumers. Defendants' acts were done to gain commercial advantage over competitors, and to drive consumers away from consideration of competitor's vehicles. Defendants'

conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

## FIFTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION
(On behalf of the Nationwide Class and, alternatively the Minnesota Subclass)

141.    Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

142.    Defendants had a duty to provide honest and accurate information to their customers so that customers could make informed decisions on the substantial purchase of automobiles.

143.    Defendants specifically and expressly misrepresented material facts to Plaintiff and Class Members, as discussed above.

144.    Defendants knew, or in the exercise of reasonable diligence, should have known, that the ordinary and reasonable consumer would be misled by Defendants' misleading and deceptive advertisements about the Class Vehicles.

145.    Plaintiff and the Class Members justifiably relied on Defendants' misrepresentations and have been damaged thereby in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION
## UNJUST ENRICHMENT
(on behalf of the Nationwide Class and, alternatively the Minnesota Subclass)

146.    Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

147.    This claim is pled in the alternative to Plaintiff's contract-based claims.

148.    VW knew or should have known that Plaintiff and the Class paid for the Class Vehicles with the expectation that they would perform as represented and were free from defects.

149.    Plaintiff and the Class conferred substantial benefits on VW by purchasing the defective Class Vehicles. VW knowingly and willingly accepted and enjoyed those benefits.

150.    VW's retention of these benefits is inequitable.

151.    As a direct and proximate cause of VW's unjust enrichment, Plaintiff and the Class are entitled to an accounting, restitution, attorneys' fees, costs and interest.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of Class Members defined above, respectfully request that the Court enter judgment against VW and award the following relief:

A.    Certification of this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiff as the representative of the Classes, and Plaintiff's counsel as counsel for the Classes;

B.      An order awarding declaratory relief and temporarily and permanently enjoining VW from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.      Appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Defendants to repair, recall, and/or replace the Class Vehicles and to extend the applicable warranties to a reasonable period of time, or, at a minimum, to provide Plaintiff and Class Members with appropriate curative notice regarding the existence and cause of the Oil Consumption Defect;

D.      An award of appropriate damages to repair or replace the Class Vehicles;

E.      A declaration that VW is financially responsible for all Class notice and the administration of Class relief;

F.      An order awarding any applicable statutory and civil penalties;

G.      An order requiring VW to pay both pre- and post-judgment interest on any amounts awarded;

H.      An award of costs, expenses, and attorneys' fees as permitted by law; and

I.      Such other or further relief as the Court may deem appropriate, just, and equitable.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a jury trial for all claims so triable.

DATED: January 30, 2025          Respectfully submitted,

<u>*/s/ Matthew D. Schelkopf*</u>
Matthew D. Schelkopf
Joseph B. Kenney
Juliette T. Mogenson
**Sauder Schelkopf LLC**
1109 Lancaster Avenue
Berwyn, PA 19312
Tel: (610) 200-0581
mds@sstriallawyers.com
jbk@sstriallawyers.com
jtm@sstriallawyers.com

*Attorneys for Plaintiffs and the Putative Class*